26 P.3d 481 (2001)
200 Ariz. 298
In re the Matter of LEON G.
State of Arizona, Petitioner,
v.
Hon. Susan A. Ehrlich, Hon. Cecil B. Patterson, Jr. and Hon. James B. Sult, Judges of the State of Arizona, in and for the Arizona Court of Appeals, Respondents;
Eric Walker, Real Party in Interest.
Nos. CV-01-0062-PR, CV-01-0063-SA.
Supreme Court of Arizona, En Banc.
July 12, 2001.
*482 Kristi A. Riggins, P.C., by Kristi A. Riggins, Phoenix, Attorney for Leon G.
Janet Napolitano, The Attorney General by Randall M. Howe, Chief Counsel, Criminal Appeals Section and Consuelo M. Ohanesian, Assistant Attorney General, Phoenix, Attorneys for State of Arizona.
Quarles & Brady Streich Lang, LLP, Phoenix, by Michael Owen Miller, Tucson, Attorneys for Amici Curiae Southern Arizona Center Against Sexual Assault, Center Against Sexual Abuse, and Arizona Voice for Victims, Inc.
Jamie McAlister Law Offices LLC by Jamie McAlister, Phoenix, Attorney for Amicus Curiae Jamie McAlister.
Daphne Budge, Phoenix, Attorney for Walker.

OPINION
McGREGOR, Justice.
¶ 1 These consolidated actions consider whether Arizona's Sexually Violent Persons (SVP) statute, Arizona Revised Statutes (A.R.S.) sections 36-3701 to 36-3717, violates the substantive due process rights of persons committed pursuant to that statute.

I.
¶ 2 A jury found beyond a reasonable doubt that Leon G. is an SVP as defined in A.R.S. section 36-3701.7. Based on this finding, the trial judge ordered his commitment to the Arizona State Hospital. The Court of Appeals reversed the order of commitment, concluding that the Arizona statute violated his substantive due process rights under the *483 Fourteenth Amendment of the United States Constitution.[1] We granted the State's petition for review pursuant to Arizona Constitution Article 6, Section 5.3, Arizona Rule of Civil Appellate Procedure 23, and A.R.S. section 12-120.24, and now affirm the judgment of the trial court.
¶ 3 After the Court of Appeals issued its decision in In re Leon G., Walker, who also had been adjudicated an SVP and committed to the State Hospital, moved for a release on the basis of that decision. The trial court granted his motion. The State then moved the Court of Appeals to issue a "blanket stay" of any releases granted pursuant to the Leon G. decision. The Court of Appeals temporarily stayed Walker's release, but denied the request for a general stay. The State filed a petition for special action in this court. We stayed all pending releases, accepted special action jurisdiction pursuant to Arizona Constitution Article 6, Section 5.3 and Arizona Rule of Procedure for Special Actions 8(b), and now grant relief.

II.
¶ 4 Before turning to the constitutional issue, we consider whether it is properly before us. Leon G.'s appointed appellate counsel filed an Anders brief that raised no issues on appeal. See Anders v. California, 386 U.S. 738, 744, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); see also State v. Leon, 104 Ariz. 297, 299, 451 P.2d 878, 880 (1969). The Court of Appeals concluded that the Anders procedure applies to appeals under the SVP act. Accordingly, after reviewing the record for error, the court independently raised the question whether the SVP act violates the principles of substantive due process and ordered supplemental briefing.
¶ 5 In Anders, the petitioner had been convicted in state court. The state appointed counsel for purposes of Anders' appeal. 386 U.S. at 739, 87 S.Ct. 1396. After reviewing the trial record, Anders' appointed counsel concluded that an appeal would lack merit. Id. He advised the court of his conclusion by letter and also informed the court that Anders wished to file his own brief. Id. at 739-40, 87 S.Ct. 1396.
¶ 6 The Court, concerned that "California's procedure did not furnish [Anders] with counsel acting in the role of an advocate nor ... that full consideration and resolution of the matter as is obtained when counsel is acting in that capacity," found that the actions of Anders' attorney had denied him his Sixth Amendment right to counsel. Id. at 743, 87 S.Ct. 1396. The Court mandated the following procedure in cases in which counsel appointed to fulfill the Sixth Amendment right to counsel concludes an appeal lacks merit:
[I]f counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses; the courtnot counselthen proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous. If it so finds it may grant counsel's request to withdraw and dismiss the appeal insofar as federal requirements are concerned, or proceed to a decision on the merits, if state law so requires. On the other hand, if it finds any of the legal points arguable on their merits ... it must, prior to decision, afford the indigent the assistance of counsel to argue the appeal.
Id. at 744, 87 S.Ct. 1396. Therefore, a criminal defendant whose appointed counsel believes that his case presents no meritorious issues for appeal remains entitled to an examination of the record by the reviewing court. Id.; see also Leon, 104 Ariz. at 299, 451 P.2d at 880.
¶ 7 The right to full review of the record on appeal when appointed counsel files an Anders brief, attached as it is to the Sixth Amendment right to counsel in criminal *484 cases, does not apply in civil proceedings. See, e.g., Denise H. v. Arizona Dep't of Econ. Sec., 193 Ariz. 257, 259 ¶ 7, 972 P.2d 241, 243 ¶ 7 (App.1998) (parent in termination of parental rights proceeding); Morganteen v. Cowboy Adventures, Inc., 190 Ariz. 463, 466 n. 5, 949 P.2d 552, 555 n. 5 (App.1997) (plaintiff in tort suit); Ortega v. Holmes, 118 Ariz. 455, 456, 577 P.2d 741, 742 (App.1978) (prisoner's application for voluntary transfer to state hospital). Commitment proceedings under the SVP statute are civil in nature. Martin v. Reinstein, 195 Ariz. 293, 307 ¶¶ 39, 41, 987 P.2d 779, 793 ¶¶ 39, 41 (App.1999) (holding that the statute does not raise either double jeopardy or ex post facto problems because it is civil, rather than criminal, in nature); cf. Kansas v. Hendricks, 521 U.S. 346, 361-69, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (discussing civil nature of analogous Kansas act). Therefore, the Anders procedure does not apply to persons committed under the SVP statute.
¶ 8 Because Leon G.'s appeal did not raise the substantive due process issue on which he now relies, we could decline to address that issue. See State v. Youngblood, 173 Ariz. 502, 504, 844 P.2d 1152, 1154 (1993) ("Even on direct appeal, we generally refuse to consider claims that are not raised below."). Although we ordinarily do not examine questions not preserved on appeal, we have made exceptions to consider questions that are of great public importance or likely to recur. See Schwab v. Matley, 164 Ariz. 421, 422 n. 2, 793 P.2d 1088, 1089 n. 2 (1990); Fraternal Order of Police Lodge 2 v. Phoenix Employee Relations Bd., 133 Ariz. 126, 127, 650 P.2d 428, 429 (1982). This action meets those exceptional criteria. Therefore, in the interests of judicial economy, and because the parties have fully argued the issue presented, we will consider whether the SVP statute complies with substantive due process requirements.

III.
¶ 9 The Supreme Court of the United States most recently addressed the substantive due process requirements for civil commitment statutes in Kansas v. Hendricks, 521 U.S. 346, 356-60, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). In that case, it examined the constitutionality of the Kansas statute that governs the commitment of sexually violent persons. Id. at 350, 117 S.Ct. 2072. Addressing Hendricks' substantive due process claim, the Court noted that "[a]lthough freedom from physical restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action, that liberty interest is not absolute[, and] ... an individual's constitutionally protected interest in avoiding physical restraint may be overridden." Id. at 356, 117 S.Ct. 2072 (internal citations and quotations omitted). In Leon G., the Court of Appeals held that, under Hendricks, the state can commit a sexually violent person only upon showing that the person has a volitional impairment that renders him dangerous beyond his control. In re Leon G., 199 Ariz. 375, 380 ¶ 18, 18 P.3d 169, 174 ¶ 18 (App.2001). The court based its holding on the Hendricks Court's reference both to the Kansas statutory language invoking volitional control and to Hendricks' admitted lack of control. 199 Ariz. at 379 ¶¶ 15-17, 18 P.3d at 173 ¶¶ 15-17; cf. In re Crane, 269 Kan. 578, 7 P.3d 285 (2000) (drawing same conclusion), cert. granted, ___ U.S. ___, 121 S.Ct. 1483, 149 L.Ed.2d 372 (2001).
¶ 10 We believe the Court of Appeals read Hendricks too narrowly and intermingled fact-specific comments in that decision with principles central to its holding. We do not understand Hendricks to impose "volitional impairment" as a separate requirement for civil commitment statutes.
¶ 11 Hendricks summarizes several requirements for involuntary civil commitment proceedings. First, the confinement must take place "pursuant to proper procedures and evidentiary standards." 521 U.S. at 357, 117 S.Ct. 2072. Next, the state must restrict commitment to "a limited subclass of dangerous persons ...." Id. In addition, and of central importance here, "[a] finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment." Id. at 358, 117 S.Ct. 2072. Instead, civil commitment statutes must "couple[] proof of dangerousness *485 with the proof of some additional factor, such as a `mental illness' or `mental abnormality.'" Id. These added statutory requirementsfactors such as mental illness or mental abnormality"serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." Id. Requiring a mental illness or mental abnormality thereby "narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." Id.
¶ 12 We think the Court's explanation makes clear its view that requiring that dangerousness be linked with or caused by an additional factor, such as mental illness or abnormality, satisfies the notion that some "volitional impairment" must render those who fit within the subclass subject to confinement dangerous "beyond their control." That is, if the state establishes not only that a person is dangerous, but also that a mental illness or abnormality caused the dangerousness, the state has met its burden to show a lack of control.
¶ 13 Our understanding of the Court's reasoning in Hendricks allows us to read that decision consistently with the Court's earlier decisions setting out the requirements for involuntary civil commitment. In a long line of cases on which it relied in Hendricks, the Court has held that the Constitution permits the civil commitment only of those persons whose future dangerousness is causally linked to a mental disorder of some kind, but has not required a separate showing of volitional impairment. See, e.g., Allen v. Illinois, 478 U.S. 364, 375, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (upholding statute allowing for the commitment of persons suffering from mental disorders who have "demonstrated propensities" to commit sex crimes); Jones v. United States, 463 U.S. 354, 369, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (upholding commitment of insanity acquittee on the basis of his "continuing illness and dangerousness"); Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (upholding commitment of dangerous, "emotionally disturbed" individuals).
¶ 14 Indeed, most general civil commitment statutes do not expressly require a showing of volitional impairment, but rather permit the confinement of those persons whom the state shows are dangerous to themselves or others as the result of a mental condition. See, e.g., A.R.S. §§ 36-501.4, 36-540 (1993) (providing for the civil commitment of a person who is a "danger to others," defined as someone who is unable to understand his need for treatment and "as a result of his mental disorder his continued behavior can reasonably be expected, on the basis of competent medical opinion, to result in serious physical harm"). Arizona's civil commitment statute, like those of most states, links dangerousness and mental abnormality, but does not require that a judge or jury separately find volitional impairment.[2] If the *486 Court of Appeals is correct that Hendricks holds that the Constitution requires a separate finding of volitional impairment in civil commitment cases, then the validity of Arizona's general civil commitment statute, as well as those of most states, would be called into question. We do not think Hendricks or the Court's earlier civil commitment decisions require a conclusion with such an extreme result.
¶ 15 In addition, the Court of Appeals' interpretation of Hendricks seems to contradict the Court's warning that the constitutionality of a commitment statute does not depend upon the particular language that a legislature chooses to narrow the class of persons eligible for commitment. Hendricks, 521 U.S. at 359, 117 S.Ct. 2072 ("[W]e have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes."). The Kansas legislature, in narrowing the class of persons eligible for commitment, defined three categories of SVPs, one of which includes those whose volitional impairment makes them likely to engage in acts of sexual violence.[3] Hendricks fell within that category defined by volitional impairment. We conclude that the Hendricks Court's references to volition, therefore, reflect not an unstated decision by the Court to establish a new constitutional requirement for civil commitment statutes, but rather the Court's attention to the Kansas legislature's choice of language in defining the category applicable to Hendricks.
¶ 16 The Hendricks Court's reluctance to require particular statutory language reflects its concern that doing so would render the "task of defining terms of a medical nature that have legal significance" difficult if not impossible. Id. at 359, 117 S.Ct. 2072; cf. Addington, 441 U.S. at 432, 99 S.Ct. 1804 (declining to require a "beyond a reasonable doubt" standard of proof in civil commitment proceedings out of concern that, "given the uncertainties of psychiatric diagnosis, [that standard] may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment"). Psychiatrists assess the risk that an individual will commit a sexually violent act in the future by diagnosing any mental disorders from which the person suffers and then examining the person's medical and life history for the presence of factors that increase his risk of re-offending, rather than by examining the person's capacity to control his behavior through the exercise of willpower. See Judith V. Becker & William D. Murphy, What We Know and Do Not Know About Assessing and Treating Sex Offenders, 4 Psychol. Pub. Pol'y & L. 116, 118-19 (1998). A volitional impairment requirement, therefore, would present significant problems in translating the medical model to a legal one.
¶ 17 In addition, a volitional impairment requirement would prevent some classes of dangerous persons from being eligible for civil commitment. Specifically, those as to whom an impairment of some capacity other than their will causes future dangerousness would fall outside the statute. For example, a person who suffers from hallucinations and therefore believes that other persons are trying to harm him may react violently to that belief. That person could choose another, less dangerous, response to his perceived reality. He is rendered dangerous, not by an *487 impairment of will, but by a mental disorder that renders him unable to perceive accurately the reality to which he willfully responds. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text revision 1994) (defining paranoid schizophrenia and noting that "[t]he essential feature of the [disorder] is the presence of prominent delusions or auditory hallucinations in the context of a relative preservation of cognitive functioning and affect"); see, e.g., In re Maricopa County Cause No. MH-90-00566, 173 Ariz. 177, 840 P.2d 1042 (App.1992) (addressing a constitutional challenge to the commitment of a man rendered dangerous to himself and others by schizophrenia involving auditory hallucinations and paranoid delusions).
¶ 18 No doubt, dangerousness caused by a mental illness or abnormality often will involve a volitional impairment, and evidence of that impairment may be relevant. Commitment statutes also envision, however, that other impairments may be involved. As a sister jurisdiction has aptly commented:
While each type of impairment is distinct, their effect can be the same. A person with a volitional impairment might suffer from a sexual compulsion such that he can not control his actions. A person with an emotional impairment might be subject to fits of anger or meanness so extreme that he can not control his actions. A person with a cognitive impairment might suffer from hallucinations or diminished perceptions such that he can not control his actions. The key here is that any of these conditions might predispose a person to commit acts of sexual violence.
In re Commitment of W.Z., 339 N.J.Super. 549, 567-68, 773 A.2d 97, 108 (2001). Holding that civil commitment statutes apply solely to persons who exhibit "volitional impairment," therefore, would deny the legislature sufficient flexibility to tailor its commitment procedures to the current state of medical knowledge in order to commit those persons whose mental illness or abnormality causes their dangerousness.
¶ 19 For all those reasons, we reject the Court of Appeals' interpretation of Hendricks as requiring a separate showing of volitional impairment. We conclude that the principles of substantive due process require that civil commitment statutes, including the SVP act, narrow the class of persons eligible for commitment by linking a finding of dangerousness to one of mental illness or abnormality, not that the causal link be volitional in nature.

IV.
¶ 20 The question remaining is whether Arizona's SVP statute complies with substantive due process principles by sufficiently narrowing the class of persons eligible for commitment. To answer that question, we examine the scope of the statute.

A.
¶ 21 Arizona's legislature enacted the Sexually Violent Persons statute as the "Sexually Violent Predators" act in 1995, and placed it in Title 13 of the codified statutes, along with the criminal laws of the state. In 1998, the legislature retitled the act "Sexually Violent Persons" and moved it to Title 36, which includes statutory provisions involving public health and safety. A.R.S. §§ 36-3701 to 36-3717 (2000 Supp.).
¶ 22 The statute defines an SVP as a person who has "ever been convicted of or found guilty but insane of a sexually violent offense or was charged with a sexually violent offense and was determined incompetent to stand trial" and who has "a mental disorder that makes the person likely to engage in acts of sexual violence." A.R.S. § 36-3701.7. A mental disorder is "a paraphilia, personality disorder or conduct disorder or any combination [of those] that predisposes a person to commit sexual acts to such a degree as to render the person a danger to the health and safety of others." A.R.S. § 36-3701.5.[4]
¶ 23 An agency that has jurisdiction over a person whom it believes to be an SVP must notify the attorney general or county attorney *488 of the person's release from custody between thirty and one hundred eighty days before that individual's release. A.R.S. § 36-3702. The agency must provide the attorney general or county attorney with information about the underlying sexual offense and the psychiatric condition of the person. Id. The attorney general or county attorney may then file a petition in superior court alleging that the person is an SVP. A.R.S. § 36-3704.
¶ 24 Upon receipt of such a petition, the superior court judge determines whether probable cause exists to believe that the person is an SVP. A.R.S. § 36-3705. The person named in the petition may request a hearing on the issue of probable cause, at which that person may present evidence on his or her behalf, may cross-examine witnesses, and may review all information in the court's file. Id. If the judge determines that probable cause exists, the judge must order the person detained in a licensed facility under the supervision of the head of the Arizona State Hospital and must order an evaluation of the person at county expense. Id.
¶ 25 Within one hundred twenty days of the petition, the court conducts a trial to determine if the person named in the petition is an SVP.[5] A.R.S. § 36-3706. Either party may request a trial by jury. Id. The person named in the petition has a right to counsel; the state provides counsel if the person is indigent. A.R.S. § 36-3704.C. In addition, the person has a right to evaluation by a competent professional, appointed by the court if the person is indigent. A.R.S. § 36-3703.
¶ 26 The state has the burden of proving beyond a reasonable doubt that the person meets the statutory definition. A.R.S. § 36-3707. If the trial judge or jury finds, beyond a reasonable doubt, that the person meets the statutory definition, then the court must either commit the person to the custody of the Department of Health Services for placement in a licensed facility or order that the person be released to a less restrictive alternative if appropriate. Id. If the SVP is committed, he or she shall receive "care, supervision or treatment until the person's mental disorder has so changed that the person would not be a threat to public safety if the person was conditionally released to a less restrictive alternative or was unconditionally discharged." A.R.S. § 36-3707.B.1. The SVP must be examined annually to determine whether commitment remains appropriate. A.R.S. § 36-3708. Either the state or the SVP may petition the court for discharge or for conditional release to a less restrictive setting with appropriate treatment and supervision. A.R.S. §§ 36-3709, 36-3714. Either petition results in a hearing, at which the SVP may be present and may participate, and the state bears the burden of proving that conditional release or discharge would be inappropriate. Id.

B.
¶ 27 Although the SVP act applies only to those persons whose mental disorder makes them likely to engage in future acts of sexual violence, the statute does not define "likely." Because the meaning attached to the term affects the scope of the class of persons subject to civil confinement under the act, we cannot compare Arizona's statute with the test defined in Hendricks without first defining this central term.
¶ 28 "Likely" is not a legal term with a fixed meaning. The dictionary defines "likely" as meaning "having a high probability of occurring or being true: very probable." Merriam-Webster's Collegiate Dictionary 674 (10th ed.1999). Courts have attached various meanings to the term, depending to large extent upon the context within which it is used. E.g., United States v. Powell, 761 F.2d 1227, 1233 (8th Cir.1985) (likely means more likely to happen than not; more probable than not); In re Foster, 426 N.W.2d 374, 377 (Iowa 1988) (likely means "probable or reasonably to be expected"); Holden v. Missouri R.R. Co., 108 Mo.App. 665, 84 S.W. 133, *489 136 (1904) (likely means "reasonably certain to accrue in the future"). The Arizona Court of Appeals has interpreted a criminal statute referring to "circumstances likely to produce death or serious physical injury," A.R.S. section 13-3623, as meaning probable as compared with possible. State v. Johnson, 181 Ariz. 346, 349, 890 P.2d 641, 645 (App.1995); see also Martin v. Reinstein, 195 Ariz. 293, 314 ¶ 68, 987 P.2d 779, 800 ¶ 68 (App.1999) (holding the SVP statute requires a probability, not a mere possibility, of future dangerousness).
¶ 29 As those decisions demonstrate, defining "likely" as meaning "probable" raises no due process concerns. See also Seling v. Young, 531 U.S. 250, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001) (upholding state court's interpretation of SVP statute that required a finding that Young more likely than not would commit future sexually violent acts). The question for us thus is not what definition of "likely" would satisfy constitutional requirements, but what definition the legislature intended to attach to the term.
¶ 30 In this instance, after considering other statutory language, we conclude that the legislature's use of the term "likely" reflects its decision to require a standard somewhat higher than "probable." Dietz v. Gen. Elec. Co., 169 Ariz. 505, 510, 821 P.2d 166, 171 (1991) (when the meaning of a statutory term is not clear, we look to the overall language of the statute for assistance). The legislature provided guidance as to the meaning of "likely" in section 10 of the SVP act, which sets out the legislative findings that led to passage of the act. Ariz. Sess. Laws 1995, Ch. 257, § 10. Subsection 3 directly addresses the civil commitment procedure adopted as part of the act. In that subsection, the legislature notes that, for a "small but extremely dangerous group of sexually violent predators," the "likelihood of the sex offenders engaging in repeat acts of predatory sexual violence is high." Id. (emphasis added). That language bears a striking similarity to the common and dictionary definitions of "likely" as being "highly probable." Construing the term as meaning "highly probable" also gives effect to the legislative decision to distinguish the standard in the SVP act from that in the general commitment statute, which requires showing behavior that "can reasonably be expected ... to result in serious physical harm." A.R.S. § 36-501.5 (1993). If the legislature had intended the same standard to apply in the two statutory schemes, we think the legislature would have used the same terms. Use of "likely" rather than "reasonably expected" indicates the legislature intended to adopt a more stringent standard in the SVP act.
¶ 31 Other jurisdictions also have interpreted "likely" in sexually dangerous persons civil commitment statutes as meaning "highly probable." See, e.g., In re Linehan, 594 N.W.2d 867, 878 (Minn.1999) (present disorder makes it "highly likely" that a defendant will engage in future harmful sexual acts); Westerheide v. State, 767 So.2d 637, 652-53 (Fla.App.2000), review granted 786 So.2d 1192 (2001) ("likely" means "highly probable or probable and having a better chance of existing or occurring than not"). The reasoning of those courts, interpreting state statutes similar to ours, supports our conclusion.
¶ 32 For these reasons, we conclude that a person meets the definition of an SVP if the state establishes, beyond a reasonable doubt, that the person has a mental disorder that makes it highly probable that the person will engage in future acts of sexual violence. In an action to a jury, the trial judge should so instruct.[6]

C.
¶ 33 The Arizona SVP statute permits the commitment of only those persons who can *490 be proven, beyond a reasonable doubt, to be dangerous to others as the result of a mental disorder. Like the Kansas statute upheld in Hendricks, it "thus requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated." Kansas v. Hendricks, 521 U.S. 346, 357-58, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). As was true of the Kansas statutes, Arizona's SVP act, by imposing those requirements, "narrows the class of persons eligible for confinement to those who are unable to control their dangerousness," id. at 358, 117 S.Ct. 2072, and therefore complies with the principles of substantive due process as articulated in Hendricks.

V.
¶ 34 For the foregoing reasons, we vacate the decision of the Court of Appeals in the case of Leon G., and affirm the trial court's order committing Leon G. to the Arizona State Hospital. We also reverse the trial court's order releasing Walker from the Arizona State Hospital.
CONCURRING: CHARLES E. JONES, Vice-Chief Justice and FREDERICK J. MARTONE, Justice.
FELDMAN, Justice.
¶ 35 I agree with the analysis and disposition of the issues covered in the opinion. I write separately only to note that in this court Walker raised an as-applied challenge to the SVP statutes, describing the conditions under which the SVP inmates or patients are held in an almost Kafkaesque manner. If accurate, that description may belie the state's argument that the statutes are not punitive but provide only for civil commitment. Of course, if they are punitive, then there are serious issues involving the double jeopardy and ex post facto clauses of both the state and federal constitutions.
¶ 36 The state argues that civil commitment and treatment of the mentally ill are, in fact, the goals of the SVP statutes and that the statutes are being applied in that manner. But the state's historical record on the treatment of the mentally ill is so dismal that its position must be taken with several grains of salt. See Arnold v. Arizona Dep't of Health Svcs., 160 Ariz. 593, 775 P.2d 521 (1989); see also Robbie Sherwood, Legislators to Try to Override Vetoes, Arizona Republic, May 10, 2001, at B4 ("If lawmakers don't override Gov. Jane Hull's veto of $25 million for the state hospital today, Arizona could land in more legal hot water.").
¶ 37 However, neither Leon G. nor Walker raised an as-applied challenge in superior court, so we have no evidentiary record to support the facts underlying the as-applied challenge Walker made in this court. As I read United States Supreme Court's latest case, such a challenge is not foreclosed if based on a sufficient factual record. See Seling v. Young, 531 U.S. 250, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001). Even if it were foreclosed under the federal constitution, I do not believe it would be under the Arizona Constitution.
¶ 38 If the state is, in fact, incarcerating rather than treating the mentally ill, we will have improperly approved a system that has been described as follows:
By committing individuals based solely on perceived dangerousness, the Statute in effect sets up an Orwellian "dangerousness court," a technique of social control fundamentally incompatible with our system of ordered liberty guaranteed by the constitution.
Adam J. Falk, Sex Offenders, Mental Illness and Criminal Responsibility: The Constitutional Boundaries of Civil Commitment After Kansas v. Hendricks, 25 AM. J.L. & MED. 117, 117 (1999).
¶ 39 In the absence of any factual record to support Walker's contentions, however, I join in the court's opinion with respect to the issues there decided.
ZLAKET, Chief Justice, dissenting:
¶ 40 Because I believe the court of appeals' opinion is legally sound, I respectfully dissent. The majority criticizes that court for reading Hendricks "too narrowly," ¶ 10 supra, and then provides a more expansive *491 interpretation of the decision. But I see little need to parse the language of the United States Supreme Court. The Hendricks opinion is clear and should be taken at face value until its authors tell us otherwise. Parenthetically, the opportunity now exists for them to do so. See In re Crane, 269 Kan. 578, 7 P.3d 285 (2000) (cert. granted, ___ U.S. ___, 121 S.Ct. 1483, 149 L.Ed.2d 372 (2001)).
¶ 41 My concerns with our SVP statutes, however, go beyond the issue of volitional control. If, as a matter of sound public policy, lawmakers decide that some offenders should be removed from society for longer periods of time than others, so be it. In that event, the legislature can prescribe greater criminal sentences. It should be noted here that Arizona already has some of the harshest penalties for sex crimes of any state in the union.
¶ 42 If, on the other hand, these individuals need treatment, it is fair to ask why they are not aggressively treated during the considerable time they spend in prison serving their sentences. The practice of warehousing human beings for long, fixed prison terms and thereafter attempting to retain them indefinitely in custody for psychiatric treatment is at best wasteful, but arguably also offends traditional notions of justice and fair play. Moreover, it threatens to turn the law of civil commitment on its head.
¶ 43 This becomes apparent when we consider the legislative history of Arizona's SVP statutes. Originally dubbed "Sexually Violent Predator" laws, these statutes were placed in Title 13, the Criminal Code. It was clearly the intent of the legislature to prolong the incarceration of sexual "predators"to keep them off the streetseven after they had served full, mandatory sentences for their crimes. In a later transparent effort to skirt constitutional objections, the statutes were redenominated by lawmakers as "Sexually Violent Persons" laws, and moved to Title 36, where our civil commitment statutes reside. Significantly, however, the applicable standard of proof remained "beyond a reasonable doubt," see A.R.S. § 36-3707, a unique feature of the criminal law. In contrast, the standard in a true civil commitment proceeding is only "clear and convincing." A.R.S. § 36-540. Without belaboring the point, I believe that our SVP laws have a distinctly penal pedigree that should subject their use to close scrutiny.
¶ 44 I suppose only time will tell if "sexually violent persons" are getting adequate professional help, are being kept under non-punitive conditions, and are actually being released within reasonable periods of time. Like Justice Feldman, I remain skeptical, especially when I see the express reference to fiscal limitations on treatment set forth in A.R.S. §§ 36-3715 and -3716.
¶ 45 Finally, I cannot help but wonder where this novel approach to crime, punishment and public safety will lead us. How can we be sure, as the attorney general has argued, that the legislature will continue to view only sexual offenders as a special and unique class of criminals? If prosecutors are able to find mental health professionals willing to testify that people who commit repetitive assaults of a non-sexual nature have a mental abnormality predisposing them to such violent behavior, will the legislature pass laws to keep them incarcerated beyond their criminal sentences by the device of civil commitment? How about perpetrators of multiple domestic violence? Chronic drunk drivers? Violent drug offenders? What are the limits of this "end run" around the normal criminal justice process?
¶ 46 These and other difficult issues must await the future. For now, I share the court of appeals' view that Hendricks requires a finding of "volitional impairment" and see nothing inappropriate in extending the Anders protocol to these cases.
NOTES
[1] The Court of Appeals did not address, and Leon G. has not raised, any claims under the Arizona Constitution.
[2] Our research reveals that those states that provide for civil commitment of mentally ill and dangerous persons do not limit the class of persons eligible for commitment to those persons whose impairment is volitional in nature. See Ala.Code § 22-52-1.1(1) (1997); Alaska Stat. § 47.30.915(12) (Michie 2000); Ark.Code Ann. § 20-47-202(j) (Michie 1993 Supp.); Cal. Welf. & Inst.Code §§ 5008, 5150 (West 1998); Colo. Rev.Stat. § 27-10-102(7) (1999 Supp.); Conn. Gen.Stat. § 17a-458(a) (2001); Del.Code Ann. tit. 16, § 5001(1) (2000 Supp.); D.C.Code Ann. § 21-501(5) (1997); Fla. Stat. ch. 394.455(18) (2001 Supp.); Ga.Code Ann. § 37-3-1 (1995); Haw.Rev.Stat. § 334-1 (1993); Idaho Code § 66-317(l) (Michie 2000); 405 Ill. Comp. Stat. 5/1-119 (1997); Ind.Code §§ 12-26-7-1 to XX-XX-X-X (1997); Iowa Code § 229.1.8 (2001 Supp.); Kan. Stat. Ann. § 59-2946(f) (2000 Supp.); Ky.Rev.Stat. Ann. § 202A.011(9) (Michie 1999); La.Rev.Stat. Ann. § 28:2(3), (14) (West 2001 Supp.); Me.Rev.Stat. Ann. tit. 34-B, § 3801.5 (West 1988); Md.Code Ann., Health-Gen. § 10-101(f) (2000); Mass. Gen. Laws ch. 123, § 1 (2001 Supp.); Mich. Comp. Laws §§ 330.1400, 330.1401 (1999); Minn.Stat. § 245.462.20 (2001 Supp.); Miss.Code Ann. § 41-21-61(e) (2000 Supp.); Mo.Rev.Stat. § 632.005 (2000); Mont.Code Ann. § 53-21-102(7) (1999); Neb.Rev.Stat. § 83-1009 (1999); Nev.Rev.Stat. 433A.115 (1999 Supp.); N.H.Rev. Stat. Ann. § 135-C:2.X (1996); N.J. Stat. Ann. § 30:4-27.2.r (West 1997); N.M. Stat. Ann. § 43-1-3.0 (Michie 2000); N.Y. Mental Hyg. Law § 9.01 (McKinney 2001 Supp.); N.C. Gen. Stat. § 122C-3(21) (1999); N.D. Cent.Code § 25-03 .1-02.10 (1999 Supp.); Ohio Rev.Code Ann. § 5122.01(A) (West 2000); Okla. Stat. tit. 43A, § 1-103(n) (1991); Or.Rev.Stat. § 426.005(1)(d) (1995); 50 Pa. Cons.Stat. Ann. § 7301(a) (West 2000); R.I. Gen. Laws § 40.1-5-2(8) (1997); S.C.Code Ann. § 44-23-10(1) (Law. Co-op.1985); S.D. Codified Laws § 27A-1-1(18) (Michie 2000 Supp.); Tenn.Code Ann. § 33-1-101(14) (1999 Supp.); Tex. Health & Safety Code Ann. § 571.003(14) (Vernon 1992); Utah Code Ann. § 62A-12-202(8) (2000); Vt. Stat. Ann. tit. 18, § 7101(14) (2000); Va.Code Ann. § 37.1-1 (Michie 2000); Wash. Rev.Code § 71.05.020(20) (2000); W. Va.Code § 27-1-2 (2000); Wis. Stat. § 51.01(13) (2001); Wyo. Stat. Ann. § 25-10-101(a)(ix) (Michie 2000).
[3] The Kansas statute defines a "sexually violent predator" eligible for commitment as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence." Kan. Stat. Ann. § 59-29a02(a) (1994). The statute provides no definition of "personality disorder," but defines "mental abnormality" as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." Kan. Stat. Ann. § 59-29a02(b) (1994). The Kansas statute therefore permits the commitment of three groups of persons: persons whose volitional impairment makes them likely to engage in predatory acts of sexual violence, persons whose emotional impairment makes them likely to do so, and persons whose personality disorder makes them likely to do so.
[4] Arizona's definition of an SVP is nearly identical to that in the Kansas statute upheld in Hendricks. See supra note 3.
[5] If the person named in the complaint was found incompetent to stand trial on the sexual offense charges, the court must determine, beyond a reasonable doubt, that the person committed the charged offense before turning to the question whether the person should be committed under the SVP act. A.R.S. § 36-3707.D.
[6] In Leon G.'s commitment proceedings, the trial court instructed the jury that it needed to find Leon G. likely to engage in future acts of sexual violence. The trial judge defined "likely" as "of such nature or so circumstantial as to make something probable and having a better chance of existing or occurring than not." However, Leon G. requested this instruction, and has not raised its appropriateness on appeal. He has therefore waived review on this issue. See State v. Miranda, 346 Ariz. Adv. Rep. 26, 27 n. 1, 22 P.3d 506, 507 ¶ 1, n. 1 (2001). The record in Walker's case does not include the jury instructions from his commitment proceeding. Walker, like Leon G., did not challenge the propriety of the instructions used at his trial.