18 P.3d 169

**In re the Matter of LEON G.**

**No. 1 CA–MH 00–0004.**

Court of Appeals of Arizona,
Division 1, Department E.

Feb. 15, 2001.
Review Granted March 20, 2001.

---

7. *See* former Ariz. Unif. R.P. Arb. 7(a) state bar committee note.

Janet A. Napolitano, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Robert L. Ellman, Assistant Attorney General, Phoenix, Attorneys for Appellee.

George A. Rouff, Yuma, Attorney for Appellant.

Leon G., Appellant, Phoenix, In Propria Persona.

## OPINION

GERBER, Judge.

¶ 1 Leon G., an indigent, appeals from an order committing him to the state hospital as a sexually violent person following a jury trial conducted pursuant to the Sexually Violent Persons Act ("the Act"), Arizona Revised Statutes Annotated ("A.R.S.") sections 36–3701 through 36–3716 (Supp.2000). Because the order deprives Leon of his liberty, we have independently reviewed the record for reversible error.

## I. BACKGROUND

¶ 2 In 1982, Leon pled guilty to five counts of child molestation pursuant to A.R.S. section 13–1410 and one count of sexual abuse pursuant to A.R.S. section 13–1404. The Yuma County Superior Court sentenced him to twelve-year terms of imprisonment for each of the molestation counts, the terms for the first three counts concurrent with each other, the last two counts concurrent with each other but consecutive to the first three, plus a two-year term of imprisonment for the sexual abuse count to be served concurrently with the first three molestation counts. Leon was required to serve at least two-thirds of his sentence before becoming eligible for release. Prior to his prison release, he was screened to determine his status as a sexually violent person. The screening psychologist opined that he suffered from a "paraphilia that predisposes him to commit sexual acts to such a degree as to render him a danger to the health and safety of others and that makes him likely to engage in acts of sexual violence."

¶ 3 Relying in part on the psychologist's assessment, the Yuma County Attorney, pursuant to A.R.S. section 36–3705, petitioned the court to order Leon's detention as a sexually violent person pending a trial on the issue. Finding probable cause, the court ordered him detained and appointed him counsel. Pursuant to A.R.S. section 36–3703, Leon's counsel and the county attorney stipulated to the appointment of Dr. Barry Morenz to evaluate him. A jury found beyond a reasonable doubt that Leon is a sexually violent person as defined in A.R.S. section

36–3701(7). The court ordered his civil commitment to the state hospital for further evaluation and treatment.

¶ 4 Leon appealed. Although this appeal is captioned as a civil matter, appointed appellate counsel filed a brief in compliance with *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969), advising this court that after a search of the entire record he found no arguable ground for reversal. Leon filed a supplemental brief arguing several issues.

¶ 5 Pursuant to *Penson v. Ohio,* 488 U.S. 75, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988), we have twice requested additional briefing from Leon and the state on three issues: 1) whether Leon is entitled to an *Anders* review, 2) whether A.R.S. section 36–3705 and related statutes apply to a defendant when such statutes were not in effect when he was sentenced in 1982, and 3) how *In re Crane,* 269 Kan. 578, 7 P.3d 285 (2000), and *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), relate to the Act. Both Leon and the state have filed supplemental briefs on these issues.

## II. DISCUSSION

*a. Anders review.*

¶ 6 Although the Act is silent as to any right of appeal, A.R.S. section 12–2101(K)(1) (1994) provides for an appeal from an order or judgment "committing a person to the state hospital." A.R.S. section 36–546.01 (1994) provides that "[a]n order for court ordered treatment may be reviewed by appeal to the court of appeals as prescribed in the Arizona Rules of Civil Procedure or by special action." Thus, the civil commitment order is appealable.

¶ 7 Leon's status as an indigent compels us to address procedural issues before considering the merits of his appeal. The Act provides committed persons with the assistance of counsel at all proceedings conducted pursuant to the Act, and indigents are given appointed counsel. *See* A.R.S. § 36–3704(C). Although *Anders* only applies in criminal cases, because the Act implicates the fundamental right to be free from physical re-

straint and because we traditionally review involuntary mental commitments, applying *Anders*—like procedures to those involuntarily committed under this Act is consistent with our policies.

▉ ¶ 8 We believe that the constitutionally required method for protecting a civilly committed indigent's right to appeal is to independently review the record for reversible error. When appointed counsel for a convicted criminal defendant can find no arguable issues for appeal, counsel files a brief containing a detailed factual and procedural history with citations to the record. *See State v. Clark,* 196 Ariz. 530, 537, ¶ 30, 2 P.3d 89, 96 (1999). The defendant is given the opportunity to file a brief *pro per. Id.* When all briefing is complete, this court reviews the record for reversible error, and if an arguable issue presents itself, we direct counsel to brief it. *Id.* After this court is satisfied that counsel has diligently reviewed the record and that it reveals no reversible error, we permit counsel to withdraw. *See id.* We adopt this procedure for appeals by indigents from superior court civil commitment orders to the state hospital, such as the one at issue here.

### b. *Leon's arguments.*

▉ ¶ 9 We affirm civil commitment orders if they are supported by substantial evidence. *See In re Pima County Mental Health Serv. Action No. MH–1140–6–93,* 176 Ariz. 565, 566, 863 P.2d 284, 285 (1993). Though the issues in this subsection are not dispositive, we address them because they could recur at trial or on appeal in this or related cases involving the Act in its present or future form.

▉ ¶ 10 Leon argues that his initial screening was defective because he did not have counsel present. *Miranda's* procedural safeguards, however, only apply to official conduct likely to elicit an incriminating response. *See State v. Smith,* 193 Ariz. 452, 457, ¶ 18, 974 P.2d 431, 436 (1999). Leon was initially screened in order to evaluate him for possible civil commitment and treatment, not to gather incriminating information for a criminal prosecution. His privilege against self-incrimination was therefore inapplicable.

*See Allen v. Illinois,* 478 U.S. 364, 375, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986)(holding that neither the Fifth Amendment nor due process requires application of privilege against self-incrimination in "sexually dangerous persons" proceedings). Furthermore, he signed a consent form advising him of the possible civil consequences of his participation in the screening program.

▉ ¶ 11 Leon also argues that the state improperly presented evidence of his prior sexual misconduct with a minor. Dr. Morenz testified that Leon, if given the opportunity, might commit further acts of sexual violence. Dr. Morenz based this opinion, in part, on the Rapid Risk Assessment for Sex Offense Recidivism (RRASOR) assessment test. One test variable was a report of an incident in Wyoming, where Leon was accused of indecent acts with a minor, but the test also included more contemporaneous behavioral indicia. Experts may properly testify regarding the factual bases for opinions such as this. *See* Ariz. R. Evid. 703; *see also State v. McKinley,* 157 Ariz. 135, 137, 755 P.2d 440, 442 (1988) (medical expert's reliance on testimony of previous molestation victims was proper basis for forming opinion regarding defendant's propensity to commit sexually aberrant acts).

▉ ¶ 12 Leon finally argues that his civil commitment under the Act as a sexually violent person invalidates his 1982 plea agreement because the possibility of civil commitment did not exist at the time he entered his plea. A trial judge need not inform a defendant of every conceivable effect of pleading guilty nor of special conditions of sentencing unless such are a "direct" consequence of pleading guilty. *See State v. Rodriguez,* 17 Ariz.App. 553, 554, 499 P.2d 167, 168 (1972); *Yuma County Juv. Action No. J–95–63,* 183 Ariz. 228, 230–31, 902 P.2d 834, 836–37 (1995).

▉ ¶ 13 Commitment under the Act is described by the majority in *Martin v. Reinstein* as a "collateral consequence" of conviction rather than a "direct" or "certain" result flowing from a plea agreement. 195 Ariz. 293, 319–20, ¶¶ 93–94, 987 P.2d 779, 805–06

(1999).[1] We conclude that application of the Act to Leon is a collateral rather than direct consequence of his guilty plea and that therefore he need not have been informed of this prospect at the time of his plea in 1982.

### c. *Constitutionality*

¶ 14 We turn now to the interpretation of the Arizona sexual predator act. We address the issue of constitutionality for two reasons: 1) involuntarily depriving a person of his liberty must be done consistent with his constitutional guarantees, and 2) Leon's supplemental brief argues that the Act is unconstitutional.

¶ 15 We are well aware of our court's *Martin* decision upholding the Act on grounds other than those presented here. The majority's conclusion in *Martin* rests in large part on the United States Supreme Court's decision in *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), a case upholding the similar Kansas Sexually Violent Predator Act. However, a subsequent Kansas Supreme Court case, *In re Crane,* 269 Kan. 578, 7 P.3d 285 (2000), interprets *Hendricks* and the Kansas act to require that a person must suffer a volitional impairment to be civilly committed under its sexual predator law. *Crane* finds its support in *Hendricks.* The United States Supreme Court stated in *Hendricks:*

> A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness with proof of some additional factor such as "mental illness" or "mental abnormality." *These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.* The Kansas act is plainly of a kind with these other ... statutes. It requires a finding of future dangerousness, and then links that finding to the existence of a "mental abnormality"

> ... that *makes it difficult, if not impossible, for the person to control his dangerous behavior.*

521 U.S. at 358, 117 S.Ct. 2072 (emphasis added), (citations omitted).

¶ 16 The fact that Hendricks could not control his behavior is mentioned throughout the opinion. *See id.* at 357, 358, 360, 362, 364, 117 S.Ct. 2072. His "lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Id.* at 360, 117 S.Ct. 2072. This lack of control appears the deciding factor for the Supreme Court to uphold the constitutionality of the Kansas statute, particularly in view of that court's language, quoted in paragraph 15 above, that a finding of dangerousness, standing alone, is insufficient for civil commitment.

¶ 17 Moreover, Hendricks' inability to control his behavior appears central to the Supreme Court's conclusion that the Kansas act could not further the deterrence objective of punishment. A person unable to control his actions cannot be deterred by the threat of confinement. *See id.* at 362–63, 117 S.Ct. 2072. The Supreme Court accordingly concluded that Hendricks' civil confinement reflected not punishment but rather his dangerous mental condition, a pathological defect. *See id.* at 363, 117 S.Ct. 2072. ("... Kansas does not intend an individual ... to remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness."). After a "controllable" sexual offender has served a prison sentence for the sexual offense, further incarceration under a sexual predator act becomes punitive rather than therapeutic. Because Hendricks' confinement was not punitive but therapeutic, the Supreme Court found that the Kansas law did not violate the *ex post facto* or double jeopardy clauses. *See id.* at 369, 117 S.Ct. 2072; *see also Martin,* 195 Ariz. at 304–6, ¶¶ 24–33, 987 P.2d at 790–2.

195 Ariz. at 307, ¶¶ 36–44, 987 P.2d at 793; *Hendricks,* 521 U.S. at 369, 117 S.Ct. 2072.

---

1. In addition, because the Act is civil in nature rather than punitive, double jeopardy and *ex post facto* considerations do not apply. *See Martin,*

¶ 18 *Crane* makes explicit what is implied in *Hendricks*. The importance of volitional impairment to the Supreme Court's analysis in *Hendricks* supports the Kansas Supreme Court's conclusion in *Crane* that "a fair reading of *Hendricks* leads ... to the inescapable conclusion that commitment under *the Act is unconstitutional absent a finding that the defendant cannot control his dangerous behavior.*" *In re Crane*, 7 P.3d at 290 (emphasis added).

¶ 19 The Kansas Act resembles Arizona's [2] but Kansas expressly defines "mental abnormality" as a condition affecting emotional or volitional capacity, a topic unaddressed in the Arizona Act. *See* Kan. Stat. Ann. § 59-29a02(b) (1999). In *Crane*, the Kansas Supreme Court found that a person need not suffer a volitional impairment by having a mental abnormality. Put differently, mental abnormality may be either cognitive or volitional, and the former does not require the latter. The Kansas Supreme Court found that its own statute failed the requirements of *Hendricks* when applied to Crane for lack of any requirement of volitional impairment. *See In re Crane*, 7 P.3d at 290.

¶ 20 Psychology seems to support this legal analysis. A law–psychology journal article commenting on sexual predator laws in the context of our precedents analyzes the difference between cognitive and volitional impairment this way:

> Like Hendricks, many people with pedophilia may experience themselves as unable to control their sexual desires for children. Many people with a variety of bad habits and addictions may similarly feel this way about their inability to exercise self-control. People addicted to TV, chocolate, tobacco, coffee, or even jogging, and people who abuse alcohol and illicit drugs, often experience themselves as being out of control and unable to resist the object of their strong desires. But this perception of being out of control, although it may explain why they do not exercise self-control, may not be accurate. People who have strong desires, particularly those rooted in unconscious psychological needs or "drives," may find their desires difficult to resist.... *There is, however, a considerable difference between a desire not resisted and an irresistible desire.*

Bruce J. Winick, *Sex Offender Law in the 1990s: A Therapeutic Jurisprudence Analysis*, 4 PSYCHOL. PUB. POL'Y & L. 505, 520–21 (1998) [hereinafter *Therapeutic Jurisprudence* ] (citations omitted) (emphasis added).[3]

◼ ¶ 21 Our Arizona Act defines "mental disorder" as a "paraphilia, personality disorder or conduct disorder or any combination [thereof] ... that predisposes a person to commit sexual acts" so as to render the person a danger to others. A.R.S. § 36-3701(5). Like the Kansas statute, our statute links a present mental disorder to future dangerousness—but nothing more is required. Volitional control is neither mentioned nor implied. Even though a disorder might at times entail an inability to control behavior, neither "conduct disorder" nor "mental disorder" necessarily requires or implies loss of volitional control.[4] Therefore,

---

2. Washington was the first state to adopt a sexual predator statute. *See* Wash. Rev.Code. Ann. § 71.09.020 (Supp.1992). Both the Arizona and Kansas acts are modeled on the Washington act. *See* Kelly A. McCaffrey, Comment, *The Civil Commitment of Sexually Violent Predators in Kansas: A Modern Law for Modern Times*, 42 KAN. L.REV. 887, 889 (1994); Brian K. Holmgren, *Sexually Violent Predator Statutes: Implications for Prosecutors and Their Communities*, PROSECUTOR, May–June 1998, at 20.

3. It is not clear that pedophilia necessarily impacts volitional control. There is nothing in the diagnostic criteria to suggest that people diagnosed with pedophilia are unable to control themselves. *Therapeutic Jurisprudence* at 523–24. "Although some conditions may be said to deprive people of the ability to control their behavior—at times, schizophrenia, major depression, Tourette's syndrome, and multiple personality disorder will qualify—pedophilia and the other paraphilias do not seem to have this effect. It may be sensible to classify the paraphilias as mental disorders for various purposes—for example, for clinical reasons or for the purpose of making employment decisions ... but when the purpose involved is civil commitment, these conditions should not qualify. *They neither render individuals incompetent to engage in rational decision making nor make them unable to resist their strong desires* to molest children or otherwise to act out sexually." *Id.* at 524–25 (emphasis added).

4. The facts of the present case illustrate the shortcomings of our statute. Dr. Morenz did not testify that Leon suffered a volitional impair-

like the Kansas statute, our statute does not explicitly impose the necessary element of volitional incapacity or its equivalent. *See id.*

¶ 22 Our judicial task requires that we construe our laws in harmony with the constitution wherever reasonably possible. *Martin*, 195 Ariz. at 301–02, ¶ 16, 987 P.2d at 787–88. We have tried to do so here and· have considered "reading into" the Act the missing volitional element. However, "[o]ur ability to interpret a statute's meaning or rectify statutory infirmities by construing the language to achieve a perceived legislative goal ... is limited by the constitutionally decreed separation of powers that prohibits this Court from enacting legislation or re-drafting defective statutes." *State v. Wagstaff*, 164 Ariz. 485, 490, 794 P.2d 118, 123 (1990).[5]

¶ 23 Using these accepted tools of statutory interpretation, we cannot find even seminal language in the Act implying volitional impairment, nor can we amend the Act by reading into it a volitional impairment concept not implied by its language. Because the Act does not require volitional impairment as mandated by *Hendricks*, we conclude that it escapes a saving interpretation and accordingly is unconstitutional.[6]

¶ 24 We are aware that this holding conflicts with *Martin* that upheld the constitutionality of this same Act. But the issue of volitional impairment was not before the *Martin* court and thus the differing analyses and results between this case and *Martin* can be readily distinguished.

### III.  CONCLUSION

¶ 25 We conclude the Act is unconstitutional. We vacate the order committing Leon for civil commitment and remand to the trial court for proceedings consistent with this opinion.

CONCURRING: PHILIP E. TOCI, Presiding Judge, and E.G. NOYES, Jr., Judge.

---

ment. He testified that out of a population consisting of 100 sex offenders of Leon's type, over a 30 year period, 52 of them would re-offend. He was not concerned "that if [Leon] were released today that he would grab a 14–year old boy off the street and have sex with him," for he did not see Leon as that kind of "rabid" predator. His concern was that over time Leon would continue to "rationalize" his behavior to the extent of putting himself in situations where he would be "at increasing risk for re-offending." This expert testimony does no more than establish the probability of recidivism among sexual offenders of Leon's type. Morenz' testimony implies that while Leon may have cognitive illusions about the legitimacy of his behavior, he is nonetheless able to control his behavior, i.e., on the evidence presented, he suffers a "cognitive distortion" rather than volitional deficit.

5. Unlike some other states, Arizona's prohibition on "reading into" a statute a saving interpretation is strict and repeated. *See also Tilson v. Mofford*, 153 Ariz. 468, 470, 737 P.2d 1367, 1369 (1987) ("courts have the power to determine ... what the constitution contains, but not what it

should contain"); *Bowslaugh v. Bowslaugh*, 126 Ariz. 517, 519, 617 P.2d 25, 27 (1979) (adding phrase to statute by "judicial fiat," despite benevolent intent, "would be an infringement upon the province of the legislature"); *Cohen v. State*, 121 Ariz. 6, 9, 588 P.2d 299, 302 (1978) ("court[s] should avoid legislating a particular result by judicial construction"); *First Nat'l Bank of Arizona v. Superior Court*, 112 Ariz. 292, 295, 541 P.2d 392, 395 (1975) (rewriting unconstitutional statute a legislative function); *Hines v. Hines*, 146 Ariz. 565, 567, 707 P.2d 969, 971 (1985) ("[c]ourts will not read into a statute something which is not within the manifest intention of the legislature as gathered from the statute itself"); *State ex rel. Lassen v. Harpham*, 2 Ariz.App. 478, 487, 410 P.2d 100, 109 (1966) (court could not "judicially legislate" by adding provision to statute).

6. In so holding, we distinguish this case from *Seling v. Young*, 531 U.S. 250, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001), in which the United States Supreme Court stated that a civil statute could not be deemed punitive "as applied" to a single individual.